Toby Klang WARD, Plaintiff, Appellant,

v.

Carol HICKEY, et al., Defendants, Appellees.

Toby Klang WARD, Plaintiff, Appellee,

v.

Carol A. HICKEY, et al., Defendants, Appellees.

The School Committee of the Town of Belmont, Defendant, Appellant.

Toby Klang WARD, Plaintiff, Appellee,

v.

Carol A. HICKEY, et al., Defendants, Appellants.

Toby Klang WARD, Plaintiff, Appellant,

v.

Carol HICKEY, et al., Defendants, Appellees.

Nos. 92–1883, 92–2240, 92–2241, 92–2271.

United States Court of Appeals, First Circuit.

Heard April 5, 1993.

Decided June 15, 1993.

Americo A. Salini, Jr., with whom Massachusetts Teachers Ass'n, Boston, MA, was on brief for plaintiff, appellant Toby Klang Ward.

Andrew J. McElaney, Jr., with whom John M. Griffin, Daniel R. Harris, and Nutter, McClennen & Fish, Boston, MA, were on brief for defendants, appellees Carol A. Hickey and Mary N. Tinkham.

David C. Hawkins, with whom Robert J. Morrissey, and Morrissey & Hawkins, Boston, MA, were on brief for the School Committee of the Town of Belmont.

Before TORRUELLA and STAHL, Circuit Judges, and BURNS,* Senior District Judge.

TORRUELLA, Circuit Judge.

Toby Klang Ward, a nontenured biology teacher in the Belmont, Massachusetts public schools, sued the School Committee of the Town of Belmont and three members of the Committee as individuals for violation of her First Amendment rights by the Committee's decision not to reappoint her on the basis of a classroom discussion. Defendants Mary Tinkham, Carol Hickey, and the late Margaret Gibson cast the deciding votes against Ward's reappointment. Based on a jury's answers to various special questions, the district court entered judgment in favor of defendants, but denied defendants' subsequent request for attorneys' fees. We affirm the district court's judgment, albeit on different grounds. In addition, we affirm part of the attorneys' fees judgment and remand the rest for a determination of whether any of Ward's litigation was frivolous.

## BACKGROUND

The dispute arose out of a discussion in Ward's ninth grade biology class concerning abortion of Down's Syndrome fetuses.[1] Defendant Tinkham learned of this discussion from a parent of a student in that class.

In June 1982, the School Committee voted on Ward's reappointment for the 1982–83 school year. A favorable vote would have granted Ward tenure. By a deadlocked vote of 3–3, however, the School Committee decided to deny reappointment.

As a result of this decision, Ward sued, alleging: (1) defendants retaliated against her for discussing abortion by voting against her reappointment; (2) defendants conspired to deny her constitutional rights by deciding not to rehire her; (3) defendants acted arbitrarily and capriciously in violation of the

---

* Of the District of Oregon, sitting by designation.

1. Some controversy also transpired over Ward's alleged discussion of Proposition 2½, a Massachusetts referendum. However, the jury found that none of the defendants' votes were motivated by that discussion, and Ward did not appeal on that issue. We therefore leave it out of our analysis.

Fourteenth Amendment; and (4) defendants wrongfully terminated her in violation of the School Committee's internal policies. On November 16, 1989, a magistrate recommended that the district court dismiss Ward's complaint for failure to state a claim, but grant Ward leave to amend her complaint to include a First Amendment "failure-to-forewarn" claim. According to the magistrate, Ward had a constitutional right to notice that her discussion was prohibited before the School Board could retaliate against her for that discussion. On August 31, 1990, the district court adopted the magistrate's recommendation, dismissed the complaint, and granted the requested leave to amend. *See Ward v. Hickey,* 781 F.Supp. 63 (D.Mass. 1990).

Subsequently, Ward filed a second amended complaint alleging the violation suggested by the magistrate. The court denied defendants' motion to dismiss with respect to that claim, but granted it to the extent that the complaint alleged a violation of a First Amendment right to discuss controversial issues in a high school class. Ward voluntarily dismissed her claim against Gibson after Gibson's death on January 3, 1991.

Ultimately, the case went to a jury in two phases. At the end of Phase I, the court asked the jury for verdicts on six special questions.[2] In response to the first five questions, the jury concluded that Tinkham voted against reappointment because of the content of Ward's classroom statements, and that Hickey and Gibson were not so motivated. Inexplicably, in response to question six, the jury found that all three committee members who voted against reappointment did so based on what they believed Ward said in her biology classroom without first investigating the matter.[3] The jury also found that Tinkham and Hickey acted recklessly in this decision.

Having narrowed the disputed issues to the vote cast by Tinkham, the district court asked the jury three additional questions in Phase II. In response to these questions, the jury concluded that Tinkham's views regarding abortion of Down's Syndrome fetuses did not conflict with the views that Tinkham believed Ward espoused.

Armed with the jury verdicts, the district court entered judgment for defendants. Specifically, the court found for Hickey because the disputed discussion did not motivate her vote. The court then relied on *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), to conclude that Tinkham's disagreement with Ward's views was an essential element of Ward's First Amendment claim.[4] Since the jury found no disagreement, the court found for Tinkham. As its members did not act improperly, the court ultimately found for the School Committee.

The court also offered alternative grounds for its judgment. According to the court, Tinkham was entitled to qualified immunity, and Ward failed to establish the School Committee's liability under 42 U.S.C. § 1983 (1981).

After the court announced its decision, Tinkham and the School Committee filed conditional motions seeking relief in the event that this court vacates the district court's judgment. The motions sought to set aside the jury's special verdicts which found that Tinkham's vote was motivated by the controversial classroom discussion, and the verdict which concluded that the individual defendants voted without investigation into what occurred in Ward's classroom. The defendants contended that the verdicts contradicted the weight of the evidence. In the alternative, they requested a new trial. The court denied the motion to set aside the jury's special verdicts, but granted a conditional new trial due to the clear weight of the

---

**2.** See the jury's special verdict forms in the appendix.

**3.** The jury's response to question six contradicts its response to the other questions regarding Gibson and Hickey, and the contradiction was unexplained on the record. However, since Ward dismissed her claim against Gibson, and did not appeal her case against Hickey, the issue is moot.

**4.** The district court employed the wrong legal standard. *See infra* p. 454.

evidence.[5] Ward appeals from the final judgment and order, except for the portion of the judgment relating to Hickey.

After the court entered its final judgment, defendants filed a motion for attorneys' fees pursuant to 42 U.S.C. § 1988. The district court denied the motion but suggested that if we reverse the fee ruling, we should only grant fees for the portion of the litigation that occurred after January 3, 1992. The court also indicated that the fees defendants requested for that portion were reasonable. Defendants appeal the denial of fees, and Ward cross-appeals, arguing for a reduction of the court's fee award in its alternative judgment.

## DISCUSSION

### I. FIRST AMENDMENT

■ In general, as Ward was a nontenured teacher the School Committee could have refused to rehire her without any reason at all. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977). However, a school committee violates the First Amendment, applicable to the states through the Fourteenth Amendment, if it denies rehiring in retaliation for a nontenured teacher's exercise of constitutionally protected speech. *Id.* at 283–84, 97 S.Ct. at 574–75; *Perry v. Sinderman*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).

■ To establish a First Amendment violation, Ward had to show that (1) her discussion of abortion of Down's Syndrome fetuses was constitutionally protected; and (2) the discussion was a motivating factor in the decision not to rehire her. *Mount Healthy City Sch. Dist. of Educ.*, 429 U.S. at 287, 97 S.Ct. at 576; *see also Miles v. Denver Public Schs.*, 944 F.2d 773, 775 (10th Cir.1991). If Ward made that showing, defendants had to establish by a preponderance of the evidence that they would not have rehired Ward even if she had not made the controversial statements. *Id.*

■ We begin with the proposition that teachers retain their First Amendment right to free speech in school. *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). On the other hand, it is well-settled that public schools may limit classroom speech to promote educational goals. *See id.* at 507, 89 S.Ct. at 736. Courts have long recognized the need for public school officials to assure that their students "learn whatever lessons [an] activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271, 108 S.Ct. 562, 570, 98 L.Ed.2d 592 (1988).

■ In light of these competing principles, we find that a school committee may regulate a teacher's classroom speech if: (1) the regulation is reasonably related to a legitimate pedagogical concern, *id.* at 273, 108 S.Ct. at 571; and (2) the school provided the teacher with notice of what conduct was prohibited, *see Keyishian v. Board of Regents*, 385 U.S. 589, 604, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967).

Through varying tests courts have afforded schools great deference in regulating classroom speech. *Krizek v. Board of Educ.*, 713 F.Supp. 1131, 1138 (N.D.Ill.1989). *See, e.g., Zykan v. Warsaw Community Sch. Corp.*, 631 F.2d 1300, 1306 (7th Cir.1980) (abuse of discretion standard for analyzing school board's decision to remove books from curriculum); *Cary v. Board of Educ. Arapahoe Sch. Dist.*, 598 F.2d 535, 543 (10th Cir. 1979) (local school boards may determine subjects taught, even if promoting particular viewpoint). Similarly, in this circuit, we have determined the propriety of school regulations by considering circumstances such as age and sophistication of students, relationship between teaching method and valid educational objectives, and context and manner of presentation. *Mailloux v. Kiley*, 448 F.2d 1242, 1243 (1st Cir.1971) (per curiam).

---

5. As the court determined that the investigation issue related only to the School Committee's liability, the court granted the new trial on that issue for the School Committee, but not for Tinkham.

Recently, the Supreme Court in *Kuhlmeier*, 484 U.S. at 273, 108 S.Ct. at 571, held that educators may limit the content of school-sponsored speech as long as the limitations are "reasonably related to legitimate pedagogical concerns." While the facts in *Kuhlmeier* differ from those in the present case, at least one court has applied this test to teachers' classroom speech. *See Miles*, 944 F.2d at 775–79; *cf. Krizek*, 713 F.Supp. at 1139.

In *Kuhlmeier*, a school principal prevented students from printing certain articles in a school newspaper. The students participated in the production of the newspaper as part of a journalism class. The Court found that because the school newspaper was not a public forum, the school could impose reasonable restrictions of expression through the paper. *Kuhlmeier*, 484 U.S. at 260, 108 S.Ct. at 562. The newspaper did not constitute a public forum because the school never exhibited that intent. Indeed, the Court's decision that a school newspaper is not a public forum also derived from the fact that it was part of the journalism class curriculum and a "regular classroom activity." *Id.* at 268, 108 S.Ct. at 568.

■ Similarly, a teacher's statements in class during an instructional period are also part of a curriculum and a regular class activity. Like *Kuhlmeier*'s school newspaper, the classroom is not a public forum, and therefore is subject to reasonable speech regulation. *See Miles*, 944 F.2d at 776 (ordinary classroom is not public forum); *Bishop v. Aronov*, 926 F.2d 1066, 1071 (11th Cir.1991).

After determining that the newspaper was not a public forum, the Supreme Court reasoned that because the speech in the school newspaper was part of the school curriculum, and therefore school-sponsored, the school was entitled to more deference in speech regulation than it would be with respect to other "personal expression that happens to occur on the school premises." *Kuhlmeier*, 484 U.S. at 271, 108 S.Ct. at 570. The Court reasoned that schools cannot be required to sponsor inappropriate speech. *Id.*

Like the newspaper, a teacher's classroom speech is part of the curriculum. Indeed, a teacher's principal classroom role is to teach students the school curriculum. Thus, schools may reasonably limit teachers' speech in that setting. *See Miles*, 944 F.2d at 776.

■ This circuit's test of teachers' speech regulation, as set out in *Mailloux*, is consistent with the Supreme Court's test, as set out in *Kuhlmeier*. *Cf. Krizek*, 713 F.Supp. at 1139. It stands to reason that whether a regulation is reasonably related to legitimate pedagogical concerns will depend on, among other things, the age and sophistication of the students, the relationship between teaching method and valid educational objective, and the context and manner of the presentation.

■ Even if under the above test a school may prohibit a teacher's statements before she makes them, however, it is not entitled to retaliate against speech that it never prohibited. *Cf. Mount Healthy City Bd. of Educ.*, 429 U.S. at 284, 97 S.Ct. at 574 (classroom speech was constitutionally protected when school board did not suggest that teacher violated any established policy, or that the board's reaction to the communication was "anything more than an ad hoc response to [plaintiff's] communication...."). Few subjects lack controversy. If teachers must fear retaliation for every utterance, they will fear teaching. As the Supreme Court warned in *Keyishian*, 385 U.S. at 604, 87 S.Ct. at 684, "[t]he danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed."

Although the Court in *Kuhlmeier* did not address the notice issue with respect to school-sponsored speech, it stated only that *prepublication control* need not be pursuant to express regulation. *Kuhlmeier*, 484 U.S. at 273 n. 6, 108 S.Ct. at 571 n. 6. This suggests that the Court would agree that *postpublication retaliation* must derive from some prior limitation. Indeed, this circuit has long recognized a teacher's right to notice of what classroom conduct is prohibited. *See, e.g., Mailloux*, 448 F.2d at 1243; *Keefe v. Geanakos*, 418 F.2d 359, 362 (1st Cir.1969).

■ Of course, while we acknowledge a First Amendment right of public school teachers to know what conduct is proscribed, we do not hold that a school must expressly prohibit every imaginable inappropriate conduct by teachers. *Cf. Krizek,* 713 F.Supp. at 1140 (warning that such requirement is an impossible and undesirable burden). The relevant inquiry is: based on existing regulations, policies, discussions, and other forms of communication between school administration and teachers, was it reasonable for the school to expect the teacher to know that her conduct was prohibited?

## II. THE DISTRICT COURT'S ANALYSIS

The district court found that under *Perry Educ. Ass'n,* the School Committee's retaliation was permissible as long as it did not suppress Ward's speech based on the viewpoint she expressed. In *Perry Educ. Ass'n,* pursuant to a collective bargaining agreement, a school permitted a teachers' association to use the interschool mailing system and the teachers' mailboxes. Under the same agreement, the school permitted no access by rival teachers' associations. A rival association sued alleging a First Amendment violation. The Supreme Court in that case held that the preferential access did not violate the First Amendment. *Perry Educ. Ass'n,* 460 U.S. at 44–54, 103 S.Ct. at 954–60. The court reasoned that a state may reserve public property for its intended use. However, it may regulate speech on that property only if the regulation is reasonable and not an effort to suppress expression due to the view expressed. *Id.* at 46, 103 S.Ct. at 955.

Under the *Kuhlmeier* rationale, *Perry Educ. Ass'n* does not apply to teachers' classroom speech. A faculty mailing system significantly differs from a school-sponsored curriculum being taught to a captive audience of youngsters. Schools need not fear that speech on a faculty mailing system will prevent students from learning appropriate classroom lessons. Indeed, while citing *Perry Educ. Ass'n,* the Court in *Kuhlmeier* did not require that school regulation of school-sponsored speech be viewpoint neutral. *See Kuhlmeier,* 484 U.S. at 270, 108 S.Ct. at 569.

■ Moreover, *Perry Educ. Ass'n* does not stand for the proposition that where a state reserves property for its intended use, regulation of speech on that property is permissible as long as it is viewpoint neutral. Even under *Perry Educ. Ass'n,* viewpoint discrimination is not an essential element of a First Amendment claim. The Court in that case specifically held that the regulation also must be reasonable. *Perry Educ. Ass'n,* 460 U.S. at 46, 103 S.Ct. at 955. Thus, even if a regulation is viewpoint neutral, it can be impermissible under *Perry Educ. Ass'n.*

## III. APPLICATION TO THE PRESENT CASE

■ On appeal, Ward does not argue that the School Committee was not entitled to limit her statements had they chosen to do so in advance. She argues only that the School Committee failed to notify her that her conduct was prohibited. Since the trial jury never determined whether Ward received such notice, she requests a trial on that issue. We find that she is not entitled to one.

Rule 51 of the Federal Rules of Civil Procedure states that without objecting before the jury retires, no party may later complain of a failure to give an instruction.[6] This rule equally applies to special interrogatories. *Phav v. Trueblood, Inc.,* 915 F.2d 764, 769 (1st Cir.1990) (citing *Anderson v. Cryovac,* 862 F.2d 910, 918 (1st Cir.1988)).

In the present case, Ward never requested a special interrogatory on the issue of notice. Moreover, while Ward essentially argues that she had no meaningful opportunity to request such a question, we find otherwise. Before submitting the Phase I special verdict

---

6. Rule 51 provides in relevant part:
   No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.

form to the jury, the district court judge held a conference in which he specifically invited the parties' suggestions. (Conference on Verdict Form at 4). Ward failed to request an interrogatory on notice at that time. Additionally, Ward failed to mention the notice issue in both of her submissions of proposed changes to the Phase I verdict form. After considering the court's proposed verdict form, Ward moved for additional interrogatories to the jury. Again, Ward made no request for a question on the notice issue. Similarly, while defendants' counsel inquired about the notice issue before submitting the Phase II verdict form to the jury, Ward did not request a question on the matter. In response to defendants' inquiry, the court stated that it would not address that issue in Phase II, and would address any further issues in future phases. After the jury answered the Phase II questions, Ward again missed her chance to request an interrogatory on the notice issue. Indeed, after Phase II, Ward specifically argued to the district court that "it's not necessary to have a phase that deals with the question of notice." (Hearing on Motions, July 7, 1992, at 22). Instead, Ward asked the court to find a lack of notice as a matter of law, which the court refused to do. It was not until six days after the court's entry of a final judgment that Ward finally requested a jury finding on the notice issue. We conclude that although Ward had numerous opportunities to request a jury determination on the principal issue of her case, she failed to do so. She therefore has waived the right to that determination, and has not made her case against defendants.

## IV. ATTORNEYS' FEES

■ Under 42 U.S.C. § 1988 (Supp.1992), a court, in its discretion, may award attorneys' fees to a prevailing party in a civil rights case.[7] A prevailing defendant in a civil rights case may recover attorneys' fees

if it can show that "plaintiff's action was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Foster v. Mydas Assocs., Inc.*, 943 F.2d 139, 145–46 (1st Cir. 1991) (quoting *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978)).

The district court denied attorneys' fees by analogizing to the interrelated claims doctrine discussed in *Lipsett v. Blanco*, 975 F.2d 934 (1st Cir.1992). Under the doctrine, once a court decides that a party has prevailed for the purposes of a fee-shifting statute, the fee award may include fees for work performed on unsuccessful claims if that party's unsuccessful claims are interrelated to the successful claims by a common core of facts or related legal theories. *Id.* at 940–41.

■ In the present case, the district court found that while some of Ward's legal theories might have been frivolous, some of the claims were permissible. The court also found all of Ward's claims interrelated. Thus, analogizing to the interrelated claims doctrine, the court denied fees on all of Ward's claims.

We find the district court's reliance on the interrelated claims doctrine misplaced. That doctrine is used for convenience in the difficult task of calculating fees. *See id.* It is inapplicable unless the court initially finds the plaintiff a prevailing party. A court may not use the doctrine to decide not to grant any fees.

■ The standard for a civil rights defendant to receive fees is high to encourage legitimate civil rights claims. *See Foster v. Mydas Assocs., Inc.*, 943 F.2d at 144. On the other hand, frivolous civil rights claims waste judicial resources that would otherwise be used for legitimate claims. *See id.* Accordingly, a district court should not deny fees for defending frivolous claims merely

---

7. Section 1988 provides in relevant part:
   In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

because calculation would be difficult. We therefore refuse to adopt the district court's primary fee judgment.

In addition to denying fees, the district court ruled in the alternative that "even if persuaded" that some of Ward's claims were frivolous, the litigation that took place before the court's order of January 3, 1992 was not frivolous, and that the requested fees for the litigation beyond that time were reasonable. Given the muddled state of the law surrounding this case, we find that the district court did not abuse its discretion in finding that Ward's claims were not clearly frivolous before January 3, 1992. Thus, we adopt the court's ruling to the extent that it denies fees for the litigation that occurred before that time.

However, in its alternative ruling, the district court never determined whether any of Ward's litigation that continued beyond that time was frivolous. We ask the district court on remand to make that determination, and calculate any fees accordingly.

### CONCLUSION

We *affirm* the district court's judgment for defendants on the merits. We also *affirm* the district court's alternate fee ruling to the extent that it denies fees for the litigation prior to January 3, 1992. However, we *remand* for a determination of which, if any, of Ward's litigation beyond January 3, 1992 was frivolous. If there was any frivolous litigation, the district court should award fees to defendants accordingly.